## ACME BRICK CO. v. UNITED STATES ZINC CO.

No. 19196.   Opinion Filed July 2, 1929.

F. B. Dillard, for plaintiff in error.

Shell Bassett, for defendant in error.

DIFFENDAFFER, C.   This appeal presents the question as to which of the parties hereto is entitled to certain overcharges in freight on certain fire clay sold by plaintiff in error, hereinafter referred to as defendant, to defendant in error, hereinafter referred to as plaintiff, and shipped from the plant of defendant at Elgin, Tex., to plaintiff at Amarillo, Tex.

Plaintiff brought the action to recover the sum of $1,448.58, the amount of the alleged overcharge for freight paid by it and repaid by the railroad company to defendant. The petition of plaintiff sets up two causes of action.

Under the first cause of action, plaintiff claims the sum of $826.89 for rebates collected by defendant, growing out of certain shipments of fire clay under a written contract, entered into between the parties, running from June 30, 1923, to June 30, 1924, the material portion of which reads:

"The seller agrees to furnish a minimum of fifty (50) tons of Elgin Standard crude fire clay per month and a maximum of three hundred (300) to four hundred (400) tons per month during the life of this contract, all material to be furnished in bulk.

"The buyer agrees to purchase a minimum of fifty (50) tons of Elgin Standard crude fire clay per month unless their plant should be shut down during any particular month. It is also agreed that the buyer shall purchase up to a maximum of four hundred (400) tons monthly in case Elgin Standard crude fire clay is found to be satisfactory for the manufacture of zinc retorts.

"Price is to be six dollars and sixty cents per net ton ($6.60) which price is f. o. b. Butler Spur. Tex., present existing freight charges allowed to Amarillo. Tex., any increase in present freight rate to be added— any decrease to be deducted."

It pleads mutual mistake in the contract, in that both parties understood and believed that the then existing legal freight rate upon the fire clay of the class sold, from defendant's plant to Amarillo, was $4.10 per ton, and that the true intent of the parties and their mutual understanding was that the

price of $6.60 per ton mentioned in the contract was made up of and arrived at upon a basis of $2.50 per ton to defendant at its plant, plus freight at $4.10 per ton, which was believed by both parties, and represented by defendant, to be the existing legal freight rate at the time, and that thereafter, and after the freight had been paid by plaintiff upon the basis, a change in the classification or reduction in the rate has been procured and the correct rate ascertained to be $2.90 per ton instead of $4.10; that defendant had collected from the railroads freight, which had been paid by plaintiff, on said fire clay, the sum of $826.89, representing the difference between the rate of $4.10, believed by both parties at the time the contract was executed to be the legal rate, and the rate of $2.90 per ton, which was afterwards ascertained to be the proper legal rate.

Plaintiff alleges that the true understanding was that the net price to defendant was to be $2.50 per ton at its plant at Elgin, Tex., and that such understanding was expressed in certain letters passing between the parties, which it attaches to its petition as part thereof as Exhibits "B" and "C."

The first is a letter from defendant to plaintiff, and the second the reply of plaintiff thereto. The parts of the letters referring to fire clay are set out in full, as they are claimed to be the contract upon which the second cause of action is based. They read:

"Acme Brick Company, Manufacturers,
"Fort Worth, Texas.
"Feb. 24, 1923.

"United States Zinc Company,
"Amarillo, Texas.

"Gentlemen:

"Attention, Mr. F. P. Lannon, Jr.
"General Superintendent.

"We are mighty sorry, Mr. Lannon, that our quotation was not in line. We might tell you frankly that we are extremely anxious to furnish material for your plant, but we hardly see how we can get down to $1.75 per ton on crude fire clay and make any money out of it.

"Our price to you was based on $2.50 at the plant, to which we added $4.10 per ton freight. This made a total delivered price to you of $6.60. Now, on fire clay out of the Missouri district, if you secure it for $1.75 per ton, you have $5.90 per ton freight to pay to Amarillo, so that your total delivered price would be $7.65 per ton, or considerably higher than the price as given you in our quotation. Likewise, the freight rate from Colorado producing points, according to information we have, is approximately 29c per cwt., or $5.60 per ton, which would mean that they would have to sell you clay at 80c per ton at their mines, to give you an equal delivered price with the figures given by us. * * * We trust that you will give this matter your good consideration again, and that you will allow us to furnish a trial car at least of our material so as to show you just what it will do in your work. We might say again that we are very anxious to ship material to your plant, and would like to have you give us frankly, your views on the subject.

"Very truly yours
"Acme Brick Company

"Geo. Puls.
"Assistant Sales Manager
"Fire Brick Department."

And:

"Feb. 28th, 1925.
"The Acme Brick Company,
"Fort Worth, Texas.

"Gentlemen:

"Referring to your letter of the 24th, I regret very much that your quotation of January 3rd was misunderstood. This was read as a quotation f. o. b. plant but if I had read a little further, I would have found that you allowed freight to Amarillo and wish to advise that we will at least try out your Elgin clay at $6.60 f. o. b. Amarillo which is based upon $2.50 f. o. b. your plant.

"It will be a little later before we will be able to take clay shipments, but at the present time, we are using a few cars of crushed fire clay and we are handling this crushing at one of our other plants. If you are in position to furnish the crushed clay in bulk, will you be kind enough to let us have your quotation?

"The rates which you quote on fire clay from other producing points seem to be correct, for the present freight rate, but for your information, we have been promised very much lower freight rates from the railroad companies and expect to have these matters straightened out in the future. These rates were based on promises made by the railroad companies before the plant was located at Amarillo, but possibly our traffic department will be able to do something in connection with a reduced rate from your point of shipment so as to keep your delivered price in line with prices which we will have from other producing points. Will you be kind enough to advise the shipping point of your Elgin clay and would like to know the name of the railroad at point of origin. * * *

"Yours very truly,
"E. P. Lannon, Jr.,
"Gen. Supt."

The second cause of action is based upon substantially the same allegations, except

that plaintiff claims the balance of the amount sued for, viz., $621.67, on account of overcharges paid by plaintiff and collected by defendant on certain shipments of fire clay made prior to the execution of the written contract mentioned in the first cause of action and claimed by plaintiff to have been made between the 28th day of February and the 30th day of June, 1923, under and by virtue of the alleged contract, composed of the two letters heretofore quoted from.

Plaintiff prayed that the contract be reformed so as to express the alleged true intent of the parties and so as to correct the sum and price therein agreed to be paid by plaintiff to defendant for said fire clay by reciting that defendant should have the sum of $2.50 per ton for the fire clay at its plant at Elgin, Tex., plus the proper freight rate of $2.90 per ton, and for judgment for the $1,448.58, the total amount of the difference between the two rates.

Defendant demurred to each cause of action, and excepted to all that part of the first cause of action, and moved to strike same, which seeks to reform the contract dated June 30, 1923, and all that part of the petition which alleged what plaintiff believed to be the existing legal freight rate at the time the contract was executed, in that same shows no cause of action in favor of plaintiff and against defendant, and by way of explanation stated that it intended to demur to all that part of the first cause of action, except that part which claims there was a reduction or reclassification in the freight rate so as to reduce same from $4.10 to $2.90 per ton after the contract was made.

The demurrer to the second cause of action was that it did not state facts sufficient to constitute a cause of action.

The demurrer was overruled as to each cause of action, and defendant answered by general denial, but admitted the execution of the written contract, specifically denied that the contract did not express the intention of the parties, denied that there was any agreement, other than that the price of the fire clay was to be $6.60 per ton, f. o. b. Butler Spur (Amarillo), but if there was any increase in the existing freight rate after the date of the contract, such increase was to be added to the price, and if there was a decrease, such decrease was to be deducted, and then alleges that there was no increase and no decrease in the rate published and authorized and existing at the date of the contract.

The same general allegations are made as to the second cause of action, and defendant specifically denies that the letters relied upon constituted a contract, and alleges that said letters referred to a price previously made by defendant of $6.60 per ton, and that the letter of defendant to plaintiff dated February 24, 1923, is only a justification of prices already quoted. Defendant further pleads settlement at the price provided in the contract and quoted in the letters.

Plaintiff replied by general denial, and further alleged that if defendant knew before the contract was executed that the correct legal freight rate was but $2.90 per ton, it was guilty of gross and intentional fraud upon plaintiff in that it had repeatedly, both before and after the execution of the contract and the shipment of the fire clay, represented to and assured plaintiff that the freight rate was $4.10, and that such representations were relied upon by plaintiff, and that plaintiff, due to the fact that defendant had shipped a great quantity of fire clay in the state of Texas, believed that defendant knew the correct freight rate and relied entirely upon defendant's representations and statements, and was induced thereby to enter into the agreement with defendant.

To this reply, defendant filed what it terms an answer to plaintiff's reply, consisting of a general denial.

At the trial, a jury was waived and the cause was tried to the court, resulting in findings in accord with plaintiff's contention, and a judgment and decree reforming the contract in paragraph 4 so as to read:

"Price to be $2.50 per ton net to seller at Butler Spur, Texas, buyer to pay existing freight charges of $4.10 per ton from Butler Spur, Texas, to Amarillo, Texas, any increase on said freight charges to be paid by buyer, any decrease from said freight charges to be deducted by buyer."

A judgment was rendered in favor of plaintiff for the amount sued for with interest thereon at the rate of six per cent. per annum, computed from June 30, 1924, in all, $1,777.

From this decree and judgment, defendant appeals.

There are 16 assignments of error, but the only ones presented in the brief and relied upon are: That the court erred in overruling the demurrers to the first and second cause of action; that the court erred in the admission of certain evidence; that the court erred in overruling defendant's de-

murrer to plaintiff's evidence and error in rendering judgment for any amount; and that the amount of the judgment is excessive.

As to the order overruling the demurrer to the first cause of action, defendant admits in its brief that: "There was a part of plaintiff's first cause of action which possibly stated a cause of action because it alleged that there was a reduction in the freight rate." But it is insisted that because there was no prayer to the first cause of action, no cause of action was stated. This contention cannot be sustained, since it has been held by this court that the prayer is no part of the statement of a cause of action. Fraley v. Wilkinson, 79 Okla. 21, 161 Pac. 156. Defendant asserts that its main objection to the first cause of action is addressed to the merits of the allegation therein. It is insisted that when plaintiff attached to its petition, as a part thereof, a copy of the written contract, which contained the clause:

"Price to be six dollars and sixty cents per net ton ($6.60) which price is f. o. b. Butler Spur, Texas, present existing freight charges allowed to Amarillo, Texas, any increase in present freight rate to be added—any decrease to be deducted"

—that it shows a definite, unambiguous, clear, and concise contract, binding upon the parties according to the very letter thereof, which can only be set aside when it is shown that its execution has been induced by fraud. In support of this contention, defendant cites sections 5041, 5042, and 5043, C. O. S. 1921, which read:

"5041. The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

"5042. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, subject, however, to the other provisions of this article.

"5043. When through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded."

It is asserted that no fraud is alleged in the petition, and therefore no sufficient allegation is contained to justify a reformation of the contract. In this we think the contention of defendant is correct as to the assertion that no sufficient allegation of fraud is contained in the petition. Plaintiff's allegations of fraud are contained in the reply, and therefore cannot be considered in passing upon the demurrer to the petition. But defendant overlooks the fact that section 5043, supra, applies to mistake or accident as well as fraud. It is mutual mistake that plaintiff relies upon, and we think the petition is sufficient. In 34 Cyc. p. 971, the rule with reference to material allegations in actions to reform written instruments is stated, as follows:

"In order to make out a good cause of action the bill, complaint, or petition should show every element necessary to entitle the complainant to equitable relief, with especial reference to the following: (1) The grounds of reformation; (2) the agreement actually made; and (3) the agreement which the parties intended to make."

In Gardner v. California Guar. Invs. Co., 137 Cal. 71, 69 Pac. 844, it was held that where the complaint alleged the actual agreement between the parties, and the particulars in which the written instrument departed therefrom, the result being a large increase in plaintiff's indebtedness, and the omission of important rights given him by the agreement and the mistake of the parties, it is sufficient to give relief. It was also held that when the written instrument and the actual contract are both set out, defective allegations in regard thereto may be treated as surplusage.

We conclude that there was no error in overruling the demurrer to the first cause of action.

As to the second cause of action, defendant asserts that the two letters relied upon and attached to the petition were insufficient to constitute a contract between the parties, and therefore no contract was shown.

In its letter to plaintiff, defendant stated:

"Our price to you was based on $2.50 at the plant, to which we added $4.10 per ton freight. This made a total price to you of $6.60. * * * We trust that you will give this matter your good consideration again, and that you will allow us to furnish a trial car at least, of our material so as to show you just what it will do in your work. We might say again that we are very anxious to ship material to your plant and would like to have you give us frankly your views on the subject."

Plaintiff in its reply stated, in part:

"Wish to advise that we will at least try out your Elgin clay at $6.60 f. o. b. Amarillo, which is based upon $2.50 f. o. b. your plant."

We think the letter of defendant amounted to an offer to sell plaintiff the fire clay at a price based upon $2.50 per ton at plant,

with freight added at $4.10 per ton.

The reply of plaintiff amounted to an acceptance of the offer, and the petition alleges that thereunder and without further negotiations plaintiff ordered, and defendant shipped, large quantities of fire clay between the date of the letters and the date of the contract, June 30th.

The demurrer was properly overruled.

Defendant complains of the admission of certain letters passing between the parties prior to the date of February 26, 1923, exhibits 1 to 5, inclusive. Exhibits 1 and 2, we think immaterial, and could have been properly rejected. But an examination thereof will disclose that they were mere introductory letters and their admission was neither helpful to plaintiff nor harmful to defendant. While their admission may have been error, no harm could have been suffered by defendant, and the error, if any, was harmless. Exhibit No. 3 was clearly admissible, as defendant therein stated to plaintiff that the freight rate was 20½ cts. per cwt., or $4.10 per ton. Numbers 4 and 5 were immaterial, but not harmful to defendant. Their admission, if error, was harmless.

Defendant also complains of the admission of six other letters, but we think there was no error in admitting same. Each one of them contained matters pertinent to the issues, and they were all properly admitted.

Under the next proposition, defendant asserts that the court erred in overruling defendant's demurrer to plaintiff's evidence.

Plaintiff's evidence was, in substance, that after the date of the letters of February 24 and 28, 1923, large quantities of fire clay were ordered by plaintiff and shipped by defendant to Amarillo, Tex. That freight bills were presented to and paid by plaintiff at the rate of $4.10 per ton. That up to June 30, 1923, when the written contract was entered into, all parties, including the railroad companies, understood the proper freight rate to be 20½ cts. per cwt., or $4.10 per ton. That after the contract was entered into the freight bills were paid at the rate of $2.90, except the last two carloads, when the railroad again decided that $4.10 was the correct rate, and that rate was paid on the last two carloads. The chief clerk of plaintiff, without the knowledge of its superintendent who executed the contract for plaintiff, paid all the freight bills on the carloads upon which the $2.90 rate was charged, deducted same from the invoice, and sent the difference between that and $6.-

60 per ton to defendant. He testified that when he did so he understood that defendant was entitled to $6.60 per ton less freight actually paid.

It appears that, some time during the life of the contract, a question arose as to which was the correct legal rate, and about the time or shortly before the contract expired defendant requested plaintiff's clerk to send it all the freight bills which had been paid, which was done.

Upon an investigation, which appears to have been made by the traffic manager of defendant, it was ascertained that there was in effect in the state of Texas certain freight rates on fire clay for distances of from 500 to 550 miles, that being substantially the distance between the plant of defendant and Amarillo. That the rates differed according to classes. That is, on treated or milled fire clay the rate was 20½ cts. per cwt., or $4.10 per ton. On fire clay, other than treated or milled, the rate was 14½ cts. per cwt., or $2.90 per ton. The claim was made that the fire clay involved was not treated or milled, and therefore the proper rate was 14½ cts. per cwt., or $2.90 per ton, and upon this claim being sustained the railroad company returned to defendant the overcharge on all freight bills upon which the rate of $4.10 had been charged, the difference between the two rates. So that it appears that defendant and not plaintiff had obtained the advantage of the lower rate.

There appears to be no controversy as to the amount. The evidence clearly shows that plaintiff at the time the first fire clay was shipped, and at the time the contract was executed, believed that the correct legal rate was $4.10. The railroad evidently so understood it, and there is abundant evidence tending to show that defendant represented to plaintiff that that was the proper legal rate. In a letter written by the assistant sales manager of defendant, dated October 13, 1924, he stated:

"The contract entered into with Mr. Lannon was based on existing freight rate at that time, which was according to published tariffs 20½ cents. There had been no reduction in this freight rate, but we are attempting to secure a readjustment so that lower prices may be made on future shipments.

"We are simply trying to secure the application of lower rates to the fire clay shipments. You will agree with us that the present rate carried in the tariff is 20½ cents, and there has been no reduction from it. There is no assurance at the present time that we will secure a refund on these

freight bills, as there is considerable controversy as to the application of the 14½ cent rate, the Texas Railroad Commission having ruled adversely."

In the first letter written by defendant to plaintiff in which prices were quoted, dated January 3, 1923, it was stated that the freight rate was 20½ cts. per cwt. In the letter from defendant to plaintiff dated February 24, 1923, it was stated:

"Our price to you was based on $2.50 at the plant, to which we added $4.10 per ton freight."

So it will be seen that all parties concerned, including the Texas Railroad Commission, understood the proper legal freight rate to be $4.10.

Plaintiff's evidence, as we view it, was clearly sufficient to prove its allegations of mutual mistake, and there was no error in overruling the demurrer thereto.

It is next urged that the court erred in rendering judgment for plaintiff. We deem it unnecessary to further review the evidence, except to say that the evidence of defendant, as we view it, tends to strengthen the case of plaintiff rather than weaken it. Mr. Harris, the traffic manager for defendant for about 8 years, testified that his duties, among others, was to ascertain and quote freight rates to the sales department, and that it was necessary in his capacity as traffic manager to be familiar with freight rate. He testified further:

"Q. You quoted the rate of 14½ cents? A. No, sir; 20½ cents. Q. At that time? By Mr. Dillard: Q. What date was that? I did not catch that. A. I think it was in the latter part of 1922. Q. You quoted the rate of 20½ cents? A. Yes, sir. By Mr. Bassett: Q. At that time, was it not a fact, Mr. Harris, that your best opinion and belief was that the 20½ cent rate covered clay of this character? A. Yes, sir. Q. Now, that rate was paid on fire clay for a considerable period of time, was it not, 20½ cent rate? A. I assume so; yes, sir. Q. Are you familiar with the ruling or the change that was made in that classification so that it came under the 14½ cent rate? A. There was no change."

The position taken by defendant is that the true and correct rate was always $2.90 per ton, and that because the contract provided that "present existing freight charges allowed to Amarillo. any increase in present freight rate to be added—any decrease to be deducted," that this meant the then existing legal rate regardless of what the parties understood the rate to be; that there had been no change in the legal rate, and that

therefore defendant was not liable for the overcharge, and was entitled to the advantage gained in ascertaining the legal rate to be less than that the parties had in mind at the time the contracts were made.

We think this position untenable and contrary to reason and justice.

Conceding that plaintiff alone was mistaken and that defendant knew all the time that the correct freight rate was $2.90, there is abundant evidence tending to show that plaintiff's source of information was from defendant alone, and that it was upon the representations and statements of defendant that plaintiff obtained its information. It is suggested that the information was available alike to plaintiff and defendant, and that if plaintiff was mistaken as to the correct freight rate, it was due to its negligence. As pointed out before, plaintiff alleged that it relied upon the statements made by defendant due to the fact that it knew that defendant had shipped large quantities of clay in Texas and was in position to learn and know the correct freight rates. Furthermore, it appears that had plaintiff inquired of the railroad company, or of the Texas Railroad Commission, the same rates would have been quoted, for at that time both the railroad company and the Texas Railroad Commission construed the rate to be $4.10 on the class of clay shipped.

It is next contended that the judgment is excessive in that interest was allowed from June 30, 1924, on the entire amount claimed. It is claimed that there is an entire absence of evidence as to when the money was received by defendant, and that there is no way to determine what amount of interest should be allowed, and consequently no way to determine what amount could be written off the judgment.

There is a stipulation in the record showing that all the rebates except two were made by the railroad prior to June 30, 1924. The date of payment direct to defendant of the excess over the $2.90 rate on 11 carloads upon which the railroad company charged but $2.90 per ton is not shown, but it must have been all prior to June 30, 1924, as the contract expired on that date and the last two cars were charged at the rate of $4.10.

The rebate on two carloads, amounting to $149.41, was not paid until August 4, 1925. The interest on this amount from June 30, 1924, to August 4, 1925, would be $9.80. The interest allowed would be excessive in this amount if no rebates had been paid or ex-

cessive freight allowance had been made prior to June 30, 1924, but some $1,297 was paid before that date, so that the interest thereon from the time same was paid to June 30th would easily amount to more than $9.80. We conclude from the record that the interest allowed is not excessive.

From the whole record, it appears that the findings of the court as to the mutual mistake is not against, but is in accord with the clear weight of the evidence, and that the decree reforming the contract was correct, and that the judgment should be affirmed.

BENNETT, HERR, HALL, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 23 R. C. L. pp. 360, 361; 3 R. C. L. Supp. p. 1325; 6 R. C. L. Supp. p. 1372; 7 R. C. L. Supp. p. 776: (2) 6 R. C. L. p. 605; 2 R. C. L. Supp. p. 162; 4 R. C. L. Supp. p. 428; 5 R. C. L. Supp. p. 357. See "Appeal and Error," 4 C. J. §2952, p. 969, n. 56. "Reformation of Instruments," 34 Cyc. p. 971, n. 33; p. 984, n. 34. "Sales," 35 Cyc. p. 52, n. 41.